**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHIRLEY J. HOLLINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:05 CV795 HEA (LMB) |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Shirley J. Hollins for Supplemental Security Income benefits under

Title XVI of the Social Security Act. The cause was referred to the undersigned United States

Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff

has filed a Brief in Support of Complaint. (Document Number 15). Defendant has filed a Brief

in Support of the Answer. (Doc. No. 18).

**Procedural History**

On January 13, 2003, plaintiff filed her application for Supplemental Security Income,

claiming that she became unable to work due to her disabling condition in 1999.[1] (Tr. 63-66).

---

[1]Plaintiff filed two prior applications for Supplemental Security Income Benefits. The first
application proceeded to the Appeals Council level, where review was denied. The second
application was denied by an administrative law judge ("ALJ") on October 10, 2002, and was not
pursued further by plaintiff. (Tr. 14). In this action, the ALJ found that there was no reasonable
basis for reopening the prior applications and that the doctrine of res judicata precluded a finding

This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated September 14, 2004. (Tr. 28, 9-26). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on April 27, 2005. (Tr. 7, 3-6). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481 (2003).

## **Evidence Before the ALJ**

**A.**    **ALJ Hearing**

Plaintiff's administrative hearing was held on June 22, 2004. (Tr. 281). Plaintiff was present and was represented by counsel. (Tr. 283). The ALJ began by admitting a number of exhibits into evidence. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she lives in St. Louis with her cousin, Odee Donaldson. (Tr. 284). Plaintiff stated that she has lived with Mr. Donaldson for eight years. (Id.). Plaintiff testified that she lived in Mississippi prior to moving to the St. Louis area in 1997 or 1998. (Tr. 285). Plaintiff stated that she was born on January 4, 1960, and is 44 years of age. (Id.). Plaintiff testified that she is five-feet-two-inches tall and weighs 129 pounds. (Id.). Plaintiff stated that her weight has fluctuated between 123 pounds and 150 pounds since she moved to St. Louis. (Tr. 285-86). Plaintiff testified that she was married when she lived in Mississippi, and that she was divorced prior to moving to St. Louis. (Tr. 286). Plaintiff stated that she has one son, who is 29 years old, and lives on his own. (Id.).

---

of disability prior to October 10, 2002. (Id.). The ALJ further found that the issue in this case is whether plaintiff has been disabled since January 14, 2003, the date of her current application. (Id.).

Plaintiff testified that she has a ninth grade education and that she took special education classes because she "was slow." (Id.). Plaintiff stated that she cannot read very well. (Id.). Plaintiff testified that she was unable to read the forms that the Social Security Administration sent her, and that her cousin read them to her. (Tr. 287). Plaintiff stated that she is unable to complete a job application on her own. (Id.). Plaintiff testified that she was able to obtain a driver's license because the questions were read to her. (Id.). Plaintiff stated that she currently has a driver's license, although she does not drive. (Id.). Plaintiff testified that is able to count only small amounts of money. (Tr. 287-88). Plaintiff stated that she has never had a checking account and that she does not know how to write a check or balance a checkbook. (Tr. 288). Plaintiff testified that she has not received any specialized training or attended vocational school. (Id.). Plaintiff stated that she attended a job corps when she was young, where she was taught reading and mathematical skills. (Id.). Plaintiff testified that she attempted to obtain her GED three times and failed the test each time. (Id.).

Plaintiff testified that she worked in a pickle factory for two years when she lived in Mississippi. (Tr. 289). Plaintiff stated that she also worked at a factory that made cakes for three years. (Id.). Plaintiff testified that when she was laid off at the cake factory, she worked cleaning fish. (Id.). Plaintiff stated that she moved to St. Louis from Mississippi "for change." (Id.). Plaintiff stated that she did not work when she arrived in St. Louis. (Id.). Plaintiff testified that she tried working for a cleaning company, but was fired because she became tired and passed out on the job. (Tr. 289-90). Plaintiff stated that she has not worked since she was fired from the cleaning company. (Tr. 290).

Plaintiff testified that she experienced seizures when she worked for the cleaning company.

(Id.).  Plaintiff stated that she has not undergone tests to determine whether she has epilepsy.[2] (Tr. 291).  Plaintiff testified that she last experienced a passing out spell within a year of the hearing when she was at a beauty shop.  (Id.).  Plaintiff stated that she was sitting in a chair having her hair done when she started sweating and vomiting, and then passed out.  (Id.).  Plaintiff testified that her beautician called an ambulance, and she was taken to the emergency room at Christian Northeast Hospital.  (Tr. 292).

Plaintiff testified that she has had two mild strokes.  (Id.).  Plaintiff stated that the first stroke occurred in 1999 when she was at home alone.  (Id.).  Plaintiff testified that she had to call her cousin, Mr. Donaldson, to come to her house.  (Id.).  Plaintiff explained that she became weak and had to lie down on the basement floor.  (Id.).  Plaintiff testified that she had another stroke a few years later, where she almost died.  (Id.).  Plaintiff stated that she was admitted to the hospital and underwent a catheterization procedure.  (Tr. 293).  Plaintiff testified that she felt dizzy and "heavy-headed" during her hospital stay.  (Id.).  Plaintiff stated that she has had no feeling in her left arm or left leg since the second stroke.  (Id.).

Plaintiff testified that she uses a cane to ambulate because both of her legs "give away." (Tr. 294).  Plaintiff stated that she has fallen many times.  (Id.).  Plaintiff testified that her last fall occurred the year of the hearing when she was at home.  (Id.).  Plaintiff explained that the cane slipped, causing her to fall on the floor.  (Id.).  Plaintiff stated that her neighbor had to come over to assist her.  (Id.).

Plaintiff testified that she has also experienced a lot of "female problems."  (Id.).  Plaintiff

---

[2]A chronic disorder characterized by paroxysmal brain dysfunction due to excessive neuronal discharge, and usually associated with some alteration of consciousness.  Stedman's Medical Dictionary, 605 (27th Ed. 2000).

stated that she is still weak from losing a significant amount of blood, although she has not had any bleeding recently. (Id.). Plaintiff testified that she underwent two procedures, including a hysterectomy.[3] (Tr. 295). Plaintiff stated that her blood pressure was high immediately following the hysterectomy. (Id.). Plaintiff testified that currently her blood pressure is high on some occasions when she goes to the doctor, and other times it is normal. (Id.). Plaintiff stated that she does not know how to take her own blood pressure. (Id.). Plaintiff testified that she feels weak and has difficulty walking when her blood pressure is high. (Tr. 296). Plaintiff stated that she experiences weakness and difficulty walking every day for periods of about 45 minutes. (Id.).

Plaintiff testified that she saw a psychiatrist the year prior to the hearing, upon the referral of her doctor. (Tr. 296-97). Plaintiff stated that the psychiatrist talked to her and made her cry. (Tr. 296-97). Plaintiff testified that the psychiatrist prescribed medication, although she did not remember the name of the medication. (Tr. 297). Plaintiff stated that she receives Medicaid benefits, which pays for her medications. (Id.).

Plaintiff testified that she spends her days sitting in her house alone. (Tr. 298). Plaintiff stated that she does not like to be around people. (Id.). Plaintiff testified that she feels "down" when she goes out in public. (Id.). Plaintiff stated that she does not drive and that she last drove about four years prior to the hearing. (Id.). Plaintiff testified that she stopped driving because she felt "heavy-headed" and did not want to be involved in an accident. (Id.). Plaintiff stated that she has not been doing any housework lately. (Id.). Plaintiff testified that she has not been cooking or cleaning because she has been feeling weak and has not felt like doing anything. (Id.). Plaintiff stated that her cousin has been doing the housework and grocery shopping. (Id.). Plaintiff

---

[3]Removal of the uterus. Stedman's at 867.

testified that she has not been going to the store because she has felt tired. (Tr. 298-99). Plaintiff stated that she occasionally goes to church on Sundays, although she cannot stay long because she becomes tired. (Tr. 299). Plaintiff testified that she does not have any friends, although she has "associates." (Id.). Plaintiff stated that she does not visit her associates at their homes, although they occasionally visit her at her home. (Id.).

Plaintiff testified that on a typical day, she spends a significant amount of time praying at home. (Id.). Plaintiff stated that she watches television in the morning until she falls asleep from taking her medication, which usually occurs at about 9:00 a.m. (Tr. 300). Plaintiff testified that she typically wakes up at about 12:00 p.m. (Id.). Plaintiff stated that she spends her afternoons sitting around and watching television. (Id.). Plaintiff testified that her cousin prepares dinner. (Id.). Plaintiff stated that in the evening, she sits around and watches television until she becomes tired. (Id.). Plaintiff testified that she typically goes to sleep at about 6:00 p.m., after taking another dosage of her medication. (Id.). Plaintiff stated that she sleeps until about 10:00 p.m., and watches television until she falls asleep again. (Tr. 301).

Plaintiff testified that she bathes and takes care of her personal needs daily. (Id.). Plaintiff stated that sometimes she does not feel like dressing, although she always changes gowns. (Id.). Plaintiff testified that Dr. Reynal L. Caldwell is her primary doctor. (Id.). Plaintiff stated that Dr. Caldwell discusses her condition with her and tells her things that she should not do. (Id.). Plaintiff testified that Dr. Caldwell told her that she should not drink a lot of sodas and eat a lot of ice. (Id.).

The ALJ then examined plaintiff, who testified that she last saw a doctor, Dr. Caldwell, about two weeks prior to the hearing. (Tr. 302).

Plaintiff stated that her position at Greenville Manufacturing involved getting cakes out of machines. (Id.). Plaintiff testified that she was not required to lift anything at that job. (Id.). Plaintiff stated that she worked full-time at that position for about three years. (Id.).

Plaintiff testified that she does not shop for groceries. (Id.). Plaintiff stated that she does not have a boyfriend. (Id.). Plaintiff testified that she has not had a boyfriend since she moved to St. Louis. (Tr. 303).

The ALJ stated that he was closing the hearing, although he would hold the record open so that plaintiff's attorney could obtain plaintiff's most recent medical records. (Id.).

### B.    Relevant Medical Records[4]

The record reveals that plaintiff presented to Metro Cardiovascular Diagnostics on April 1, 2002. (Tr. 239). Plaintiff was diagnosed with dysthymia,[5] hypertension,[6] and mitral valve

---

[4]Although  res judicata applies to the period before October 10, 2002, medical evidence prior to this date may be considered insofar as it serves as a background for new and additional evidence of deteriorating mental or physical conditions occurring after the prior proceeding. See Robbins v. Secretary of Health and Human Services, 895 F.2d 1223, 1224 (8th Cir. 1990) (per curiam).

[5]A chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness. Stedman's at 556.

[6]High blood pressure. Stedman's at 855.

prolapse[7] with mitral regurgitation.[8]  (Id.).  Plaintiff's medications were listed as Diovan,[9]

Toprol,[10] Lotrel,[11] and Effexor.[12]  (Id.).  Plaintiff was prescribed Zyrtec[13] and Ambien.[14]  (Id.).

Treatment notes from Metro Cardiovascular Diagnostics reveal that plaintiff was diagnosed with

hypertension, uncontrolled; and dysthymia on April 22, 2002.  (Tr. 227).  On May 30, 2002,

plaintiff presented to Metro Cardiovascular Diagnostics complaining of headaches.  (Tr. 237).

Plaintiff was diagnosed with hypertension, uncontrolled; and diabetes was to be ruled out.  (Id.).

On September 28, 2002, plaintiff complained of fatigue.  (Tr. 225).  On November 7, 2002,

plaintiff complained of chest pain.  (Tr. 224).  Plaintiff was diagnosed with syncope.[15]  (Id.).  It

was also noted that plaintiff was non-compliant with her medications.  (Id.).  Plaintiff continued to

complain of chest pain on November 14, 2002.  (Tr. 223).  It was again noted that plaintiff was

---

[7]Excessive retrograde movement of one or both mitral valve leaflets into the left atrium during left ventricular systole, often allowing mitral regurgitation.  Stedman's at 1455.  A leaflet is a layer of phospholipid.  Id. at 979.

[8]Reflux of blood through an incompetent aortic valve into the left ventricle during ventricular diastole.  Stedman's at 1546.

[9]Diovan is indicated for the treatment of hypertension.  See Physician's Desk Reference (PDR), 2297 (59th Ed. 2005).

[10]Toprol is indicated for the treatment of hypertension, angina pectoris, and heart failure. See PDR at 633.

[11]Lotrel is indicated for the treatment of hypertension.  See PDR at 2338.

[12]Effexor is indicated for the treatment of major depressive disorder.  See PDR at 3321

[13]Zyrtec is indicated for the relief of symptoms associated with seasonal allergic rhinitis. See PDR at 2688.

[14]Ambien is indicated for the short-term treatment of insomnia.  See PDR at 2980.

[15]Loss of consciousness and postural tone caused by diminished cerebral blood flow. Stedman's at 1745.

not taking her medications.  (Id.).  Plaintiff complained of fatigue on November 21, 2002.

(Tr. 222).  Plaintiff was diagnosed with uncontrolled hypertension, with a notation that plaintiff

was non-compliant with her medications.  (Id.).  On November 27, 2002, plaintiff complained of

increased fatigue.  (Tr. 221).  Plaintiff's diagnosis was stable hypertension.  (Id.).

Plaintiff underwent an echocardiogram[16] and a cardiac doppler study[17] at Metro

Cardiovascular Diagnostics on December 30, 2002.  (Tr. 254).  The echiocardiogram revealed left

atrial enlargement, thickened mitral leaflets, and left ventricular hypertrophy.[18]  (Id.).  The doppler

study revealed diastolic dysfunction of the left ventricle, mild mitral valve regurgitation, and mild

tricuspid valve regurgitation.  (Id.).

Plaintiff was seen at Metro Cardiovascular Diagnostics on February 4, 2003, for

complaints of chest pain.  (Tr. 218).  Plaintiff's medications were listed as Diovan, Toprol, Nitrex,

Clonidine,[19] Atacand,[20] and Lexapro.[21]  (Id.).

On February 6, 2003, plaintiff presented to Forest Park Hospital, complaining of a sudden

onset of left knee pain as well as left lateral thigh pain.  (Tr. 212).  A physical examination

---

[16]The record obtained by echocardiography, which is the use of ultrasound in the investigation of the heart and great vessel and diagnosis of cardiovascular lesions.  Stedman's at 563.

[17]A diagnostic instrument that emits an ultrasonic beam into the body.  Stedman's at 536.

[18]Hypertrophy is a general increase in bulk of a part or organ, not due to tumor formation. Stedman's at 857.

[19]Clonidine is indicated for the treatment of hypertension.  See PDR at 988.

[20]Atacand is indicated for the treatment of hypertension.  See PDR at 611.

[21]Lexapro is indicated for the treatment of major depressive disorder.  See PDR at 1282.

revealed no evidence of bone or joint abnormality, and no fracture or dislocation. (Tr. 216).

Plaintiff was prescribed a knee immobilizer. (Tr. 217).

A Psychiatric Review Technique was completed by a non-examining state agency physician, Dr. Justo J. Cabanas, on March 21, 2003. (Tr. 73-81). The physician indicated that there was insufficient medical evidence to diagnose plaintiff with an affective disorder. (Id.).

On March 31, 2003, a non-examining state agency medical consultant, Dr. Judy Vogelsang, completed a Physical Residual Functional Capacity Assessment. (Tr. 82-89). Dr. Vogelsang expressed the opinion that plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk at least 2 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, and push or pull an unlimited length of time. (Tr. 83). Dr. Vogelsang found that plaintiff could only occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl, and could frequently climb ladders, ropes or scaffolds, and balance. (Tr. 84). Dr. Vogelsang found no manipulative, visual, communicative, or environmental limitations, except that plaintiff should avoid concentrated exposure to extreme cold and extreme heat. (Tr. 85-86).

Plaintiff underwent a myocardial[22] perfusion SPECT[23] study on August 1, 2003 at Christian Hospital Northeast, which revealed no reversible ischemia,[24] and a fixed defect involving

---

[22]The myocardium is the middle layer of the heart, consisting of cardiac muscle. Stedman's at 1173.

[23]Abbreviation for single photon emission computed tomography, which is tomographic imaging of metabolic and physiologic functions in tissues. Stedman's at 1842.

[24]Local anemia due to mechanical obstruction. Stedman's at 924.

the apicoseptal[25] region consistent with an old infarct.  (Tr. 204).

Plaintiff presented to Glenn M. Sherrod, D.O., on August 20, 2003, with complaints of chest pain.  (Tr. 139-40).  Plaintiff also reported difficulty with ambulation and stated that her legs "give away" easily, resulting in frequent falls.  (Tr. 139).  Dr. Sherrod noted that this has been apparent for the past 25 years.  (Id.).  Plaintiff's medications were listed as Hyzaar,[26] Celexa,[27] and Ultracet.[28]  (Id.).  It was noted that plaintiff had suffered two previous "strokes," and that she has been treated for hypertension for the past twenty years.  (Id.).  No neurological deficits consistent with a stroke have been found.  (Id.).  Dr. Sherrod noted that plaintiff has undergone two previous cardiac catheterizations, which have been negative.  (Id.).  Dr. Sherrod conducted a mental status examination, which revealed that plaintiff had adequate judgment and insight and fluent speech.  (Tr. 140).  Dr. Sherrod concluded that plaintiff's history is suggestive of a long-standing T10-T12[29] radiculopathy.[30]  (Id.).  He stated that further evaluation was needed to

---

[25]The apex of the septum, which is a thin wall dividing two cavities of softer tissue.  See Stedman's at 1620.

[26]Hyzaar is indicated for the treatment of hypertension.  See PDR at 2061.

[27]Celexa is indicated for the treatment of depression.  See PDR at 1270.

[28]Ultracet is indicated for the short-term (five days or less) management of acute pain.  See PDR at 2550.

[29]Abbreviation for thoracic vertebra (T1-T12).  Stedman's at 1781.  The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[30]Disorder of the spinal nerve roots.  Stedman's at 1503.

exclude structural causes.  (Id.).  Dr. Sherrod scheduled an MRI[31] of the thoracic spine and lab studies.  (Id.).

Plaintiff underwent an MRI of the thoracic spine on August 28, 2003, which was unremarkable.  (Tr. 138).  No cord or thecal sac compression or disc protrusion was found at any level.  (Id.).

Plaintiff saw Dr. Reynal L. Caldwell on September 12, 2003, at which time Dr. Caldwell diagnosed plaintiff with anemia.[32]  (Tr. 163).  On October 7, 2003, Dr. Caldwell diagnosed plaintiff with enlarged uterus, menorrhogia,[33] and allergic rhinitis.[34]  (Id.).

Plaintiff presented to Christian Hospital on October 8, 2003, complaining of vaginal bleeding.  (Tr. 190).  Diagnoses of hypertension and anemia were also noted.  (Id.).

Plaintiff presented to Christian Hospital again on November 20, 2003, with complaints of severe low abdominal pain.  (Tr. 144).  The impression of the examining physician, Dr. Josiah Ekunno, was uterine fibroids;[35] severe dysmenorrhea;[36] and possibility of pelvic inflammatory

---

[31]Abbreviation for magnetic resonance imaging.  Stedman's at 1135.

[32]Any condition in which the number of red blood cells, hemoglobin, or the volume of packed red blood cells are less than normal.  Anemia is frequently manifested by pallor of the skin and mucous membranes, shortness of breath, palpitations of the heart, soft systolic murmurs, lethargy, and fatiguability.  See Stedman's at 73-74.

[33]Excessively prolonged or profuse menses.  Stedman's at 851.

[34]Inflammation of the nasal mucous membrane associated with hay fever.  See Stedman's at 1566.

[35]Composed of fibers or fibrous tissues.  Stedman's at 670.

[36]Difficult and painful menstruation.  Stedman's at 553.

disease.[37]  (Id.).  Plaintiff underwent a total abdominal hysterectomy.  (Tr. 145).

Plaintiff saw Dr. J. Heins on January 16, 2004, complaining of a goiter.  (Tr. 172-73).  Dr. Heins diagnosed plaintiff with a simple goiter,[38] hypertension, and seizure disorder.[39]  (Tr. 173).

Plaintiff saw Dr. Caldwell on January 23, 2004, at which time she complained of depression.  (Tr. 162).  Dr. Caldwell's diagnosis was hypertension and depression.  (Id.). On February 13, 2004, plaintiff reported to Dr. Caldwell that she had been feeling tired since undergoing the hysterectomy.  (Tr. 131).

On March 24, 2004, plaintiff saw Dr. Caldwell for a follow-up regarding her depression. (Id.).  Dr. Caldwell noted that plaintiff's depression had improved since she started the Lexapro. (Id.).  Dr. Caldwell increased plaintiff's dosage of Lexapro.  (Id.).

Plaintiff saw Dr. Caldwell on April 8, 2004, at which time he diagnosed plaintiff with hypertension.  (Tr. 130).  On May 9, 2004, plaintiff complained of "blacking" or "falling out" for two to three days prior to that visit.  (Id.).  Dr. Caldwell's assessment was syncope.  (Id.).  He referred plaintiff to cardiology and neurology for further evaluation.  (Id.).  Dr. Caldwell also diagnosed plaintiff with hypertension, which was improved with the current regimen.  (Id.).

Plaintiff saw Dr. Caldwell on June 9, 2004, at which time she complained of seizures, back pain, and high blood pressure.  (Tr. 129).  Dr. Caldwell's diagnosis was seizure disorder and

---

[37]Acute or chronic suppurative inflammation of female pelvic structures due to infection; typically a complication of sexually transmitted infection of the lower genital tract.  See Stedman's at 519.

[38]Thyroid enlargement unaccompanied by constitutional effects, commonly caused by inadequate dietary intake of iodine.  Stedman's at 762.

[39]Synonym for epilepsy.  See Stedman's at 1614.

hypertension.  (Id.).  He noted that plaintiff had seen a cardiologist and she is not going to have

the recommended cardiac catheterization.  (Id.).  Dr. Caldwell recommended a neurology consult.

(Id.).  On July 13, 2004, Dr. Caldwell prescribed Tarka[40] and Skelaxin.[41]  (Tr. 165).


## The ALJ's Determination

The ALJ made the following findings:

1.     The claimant has not engaged in substantial gainful activity since at least 1994.

2.     The medical evidence establishes that the claimant has hypertension, mild mitral regurgitation and a history of a sub-endocardial infarction.  The claimant has mild, stable and non-severe dysthymia.  The claimant does not have an impairment or combination of impairments listed in, or medically equal to, the appropriate listings set forth in Appendix 1, Subpart P, Regulations No. 4.

3.     The allegations of symptoms, or combination of symptoms, of such severity as to preclude all types of work activity are not consistent with the evidence as a whole and are not persuasive.

4.     The claimant's impairments preclude: lifting and carrying more than ten pounds and prolonged standing and walking.  The claimant does not have a severe mental impairment imposing more than no to mild limitations, for twelve consecutive months, upon her activities of daily living, social interaction, concentration, persistence, pace, attention, abilities to cope with stress; abilities to make judgment and abilities to work a full work day or work week without decompensation.

5.     The claimant does not have past relevant work.

6.     The claimant is a younger individual with a high school education.

7.     In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

---

[40]Tarka is indicated for the treatment of hypertension.  See PDR at 520.

[41]Skelaxin is indicated for the relief of discomforts associated with acute, painful musculoskeletal conditions.  See PDR at 1793.

8.    The claimant can perform other work existing in significant numbers. This finding is based upon Medical-Vocational Rules 201.24 through 201.29, of Table No. 1 of Appendix 2, Subpart P, Regulations No. 4.

9.    The claimant has been able to perform other work, existing in significant numbers at all times during the period in issue. The claimant has been able to perform substantial gainful activity. The claimant has not been under a disability, as defined under the Social Security Act, at any time through the date of this decision.

(Tr. 25).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based upon the application filed on January 14, 2003, the claimant is not entitled to a Period of Disability or Disability Insurance Benefits, under Sections 216(i) and 223, respectively, of the Social Security Act.

(Tr. 26).

# Discussion

## A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

## B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity"

determination.  <u>See</u> <u>id.</u>

   If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.
<u>See</u> <u>id.</u>  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  <u>See</u> <u>id.</u>  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  <u>See</u> <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998).

   The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  <u>See</u> 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  <u>See</u> <u>id.</u>  Previously, a standard document

entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000).  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the

Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).


C.      **Plaintiff's Claims on Appeal**

Plaintiff raises three claims on appeal of the Commissioner's decision.  Plaintiff first argues that the ALJ erred in assessing plaintiff's residual functional capacity.  Plaintiff next argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Plaintiff finally argues that the ALJ erred in failing to obtain vocational expert testimony.  The undersigned will address each claim in turn, beginning with the ALJ's credibility assessment.

1.      **Credibility Assessment**

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Defendant contends that the ALJ made a proper credibility determination and found that plaintiff's allegations regarding her limitations were not fully credible.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully

corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322.

Under Polaski, an ALJ must also consider a claimant's prior work record, observations by third parties and treating and examining doctors, and the claimant's appearance and demeanor at the hearing. 739 F.2d at 1322. In evaluating the evidence of nonexertional impairments, the ALJ is not free to ignore the testimony of the claimant "even if it is uncorroborated by objective medical evidence." Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996).

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence. The ALJ properly pointed out Polaski factors and other inconsistencies in the record as a whole which detract from plaintiff's complaints of disabling impairments. The ALJ first conducted an exhaustive summary of the medical record in his fifteen single-spaced page opinion. The ALJ concluded that plaintiff's complaints of disabling impairments are unsubstantiated by the medical record.

The ALJ stated that records from Metro Cardiovascular Diagnostics reveal that plaintiff

reported a variety of complaints, yet the treatment notes do not document objective medical findings regarding these complaints. The ALJ noted that medical testing of plaintiff's heart conducted on December 2002 and August 2003 are inconsistent with plaintiff's allegations of disability. (Tr. 254). The ALJ stated that no bone or joint abnormalities were found, and an MRI of plaintiff's thoracic spine was unremarkable. (Tr. 128, 216). The ALJ acknowledged that plaintiff suffered from vaginal bleeding and weakness, but noted that these symptoms lasted only one month. The ALJ pointed out that, although plaintiff testified that she requires the use of a cane, there is no medical evidence that plaintiff was prescribed a cane or other assistive device. The ALJ stated that plaintiff's testimony is inconsistent with the medical evidence, which undermines plaintiff's credibility.

With regard to plaintiff's mental impairments, the ALJ stated that, although plaintiff was diagnosed with depression on January 23, 2004, treatment notes do not document medical findings of any significant mental distress. (Tr. 162). He noted that plaintiff did not complain of depression prior to January of 2004. Further, on March 24, 2004, Dr. Caldwell found that plaintiff's depression had improved since she had been taking Lexapro. (Tr. 131). Plaintiff's depression was not mentioned in subsequent treatment notes. The ALJ thus concluded that plaintiff does not suffer from a severe mental impairment.

The ALJ further stated that, although plaintiff testified at the hearing that she only completed the ninth grade and attended special education classes, there are no medical or school records documenting this. The ALJ pointed out that plaintiff's testimony at the hearing is inconsistent with prior statements plaintiff made to the Social Security office and to a consultative physician, where plaintiff indicated that she had completed high school and obtained a diploma.

The ALJ thus found that plaintiff's inconsistent statements regarding her education undermine her credibility.

The ALJ next discussed plaintiff's medications. The ALJ stated that there is no evidence that plaintiff experiences any side effects from her medications. Plaintiff did not indicate at the hearing that she experienced any side effects, and the medical record does not reveal any such complaints. The absence of side effects from medication is a proper factor to be considered in evaluating subjective complaints of pain. See McKinney v. Apfel, 228 F.3d 860, 864 (8th Cir. 2000). In addition, plaintiff's treating physician, Dr. Caldwell, indicated that plaintiff's depression had improved since she had been taking Lexapro. (Tr. 131). Evidence of effective medication resulting in relief may diminish the credibility of a claimant's complaints. See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999).

The ALJ also pointed out that plaintiff's physicians consistently noted that plaintiff was noncompliant with regard to her medications and treatment. (Tr. 222-224). The ALJ stated that plaintiff's noncompliance is inconsistent with her claim of disabling impairments. The failure to follow a recommended course of treatment weighs against a claimant's credibility. See Gowell v. Apfel, 242 F.3d 793, 797 (8th Cir. 2001).

The ALJ next discussed plaintiff's work history. The ALJ stated that plaintiff's earnings record does not establish a strong work history and indicates a certain degree of benefit motivation. Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work history is a proper factor in assessing credibility. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996).

Finally, the ALJ discussed plaintiff's daily activities. He stated that plaintiff alleged during

the hearing that her daily activities are greatly limited. The ALJ, however, noted that due to the factors discussed that undermine plaintiff's credibility, her allegations of severely limited daily activities also lack credibility. The ALJ concluded, "[t]hus, in light of the above, the undersigned finds not credible the claimant's description of her symptoms and limitations of function." (Tr. 23).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the ALJ discussed each of the relevant Polaski factors in detail. The reasons given above by the ALJ for discrediting plaintiff's complaints of disabling impairments are sufficient and his finding that plaintiff's complaints are not credible is supported by substantial evidence. Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

**2.    Residual Functional Capacity**

Plaintiff next argues that the ALJ erred in assessing her residual functional capacity. Specifically, plaintiff contends that the ALJ failed to consider the standards set forth in Singh v. Apfel, 222 F.3d 448 (8th Cir 2000), and Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001). Defendant argues that the ALJ properly evaluated plaintiff's residual functional capacity.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the

workplace.'" <u>Hutsell v. Massanari</u>, 259 F.3d 707, 712 (8th Cir. 2001) (quoting <u>Lauer</u>, 245 F.3d at 704). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting <u>McKinney</u>, 228 F.3d at 863).

After discussing the objective medical evidence and plaintiff's own testimony regarding her impairments, the ALJ concluded:

> [a]fter giving the claimant all possible but reasonable benefit of the doubt, the undersigned finds that the record establishes that the claimant's impairments preclude at most: lifting and carrying more than ten pounds and prolonged standing and walking. The claimant['s] dysth[y]mia is mild and stable. The claimant does not have a severe mental impairment imposing more than no to mild limitations, for twelve consecutive months, upon her activities of daily living, social interaction, concentration, persistence, pace, attention, abilities to cope with stress; abilities to make judgment and abilities to work a full work day or work week without decompensation. The substantial evidence does not establish the existence of any other persistent, significant, and adverse limitation of function due to any other ailment. These findings are consistent with the treatment notes and the findings by the state agency medical doctor.

(Tr. 23). The residual functional capacity formulated by the ALJ is consistent with the record as a whole.

The medical record does not support the existence of any greater restrictions. Notably, plaintiff's treating physicians did not impose any restrictions on plaintiff. The state agency medical consultant, Dr. Vogelsang, expressed the opinion that plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk at least 2 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, and push or pull an unlimited length of time. (Tr. 83). The state agency psychiatrist found that there was insufficient evidence for a diagnosis of an affective disorder. (Tr. 73-81). As such, the ALJ's determination that plaintiff could lift no more

than ten pounds, was precluded from prolonged standing and walking, and does not have a severe

mental impairment, is consistent with the objective medical record.

Plaintiff argues that the ALJ did not properly consider her fatigue that is secondary to

anemia, and secondary to her gynecological condition. Plaintiff underwent a total abdominal

hysterectomy in November 2003. (Tr. 145). The record does reveal complaints of fatigue prior

to and immediately following this surgery. The ALJ acknowledged that plaintiff complained of

short-term fatigue, but pointed out that plaintiff did not complain of fatigue after March 13, 2004.

(Tr. 20). As such, the ALJ considered plaintiff's fatigue as an impairment and found that

plaintiff's fatigue did not cause a decrease in function during the relevant period.

Plaintiff also argues that the ALJ erred in finding her mental impairment was not severe.

Plaintiff claims that this err was particularly egregious because the state agency consulting

physician, Dr. Cabanas, indicated that the case should be further developed. Dr. Cabanas, the

state agency consulting physician, completed a Psychiatric Review Technique on March 21, 2003.

(Tr. 73-81). Dr. Cabanas indicated that there was insufficient medical evidence to diagnose

plaintiff with an affective disorder, and recommended that additional evidence be obtained

regarding the signs and symptoms of plaintiff's mental impairment. (Id.). It is true that the ALJ

has a duty to fully develop the record, particularly where a claimant is not represented by counsel.

See Driggins v. Harris, 657 F.2d 187, 188 (8th Cir. 1981). However, an "ALJ is permitted to

issue a decision without obtaining additional medical evidence so long as other evidence in the

record provides a sufficient basis for the ALJ's decision." Anderson v. Shalala, 51 F.3d 777, 779

(8th Cir. 1999) (quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)). Further, no error

exists where there is substantial medical evidence in the record, particularly by treating source

physicians, which strongly supports an ALJ's decision. <u>See</u> <u>Isaacs v. Barnhart</u>, 196 F. Supp.2d 934, 942 (D. Neb. 2001) (citing <u>Haley</u> 258 F.3d at 749-750).

In this case, Dr. Cabanas rendered his opinion in March 2003. Plaintiff's administrative hearing was not held until September 14, 2004. As such, plaintiff had ample time in which to supplement the record. Further, the medical evidence of record from treating sources supports the ALJ's decision. For example, in March 2004, a year after Dr. Cabanas rendered his opinion, plaintiff's treating physician, Dr. Caldwell, indicated that plaintiff's depression had improved since plaintiff began taking Lexapro. (Tr. 131). Plaintiff's depression is not noted in subsequent treatment notes. As such, the ALJ's finding that plaintiff's depression is not severe is supported by the medical record and it was not error for the ALJ to decline to further develop the record.

The ALJ's residual functional capacity determination is supported by substantial evidence in the record as a whole. The ALJ performed a credibility analysis and determined that plaintiff's subjective allegations were not entirely credible. The ALJ then properly assessed a residual functional capacity that is consistent with the objective medical evidence and plaintiff's own testimony. The record is not supportive of any greater restrictions than those found by the ALJ.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

### 3. Vocational Expert Testimony

Plaintiff finally argues that the ALJ improperly relied on the Medical-Vocational Guidelines because she has significant nonexertional limitations. Plaintiff contends that the ALJ should have obtained vocational expert testimony. Defendant argues that the ALJ properly relied on the Medical-Vocational Guidelines.

As set forth above, once a claimant establishes that he or she is unable to return to past relevant work, the final step in the sequential process requires a determination of whether a claimant can perform other work in the national economy. "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the Medical-Vocational Guidelines or 'Grids,' which are fact-based generalization[s] about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999) (quotation omitted). Use of the guidelines is permissible only if the claimant's characteristics match those contained in grids and only if the claimant does not have non-exertional impairments. See Foreman v. Callahan, 122 F.3d 24, 25 (8th Cir. 1997).

As explained by the Eighth Circuit, "[t]he grids [] do not accurately reflect the availability of jobs to people whose impairments are non-exertional, and who therefore cannot perform the full range of work contemplated within each table." Id. at 26. Accordingly, the Eighth Circuit requires "the Commissioner [to] meet his burden of proving that jobs are available for a significantly nonexertionally impaired applicant by adducing the testimony of a vocational expert." Id. "[W]here a claimant suffers from a non-exertional impairment which substantially limits his ability to perform gainful activity, the grid cannot take the place of expert vocational testimony." Id. (quoting Talbott v. Bowen, 821 F.2d 511, 515 (8th Cir. 1987)). An ALJ may rely on the Grids, however, when the ALJ properly discredits a claimant's subjective complaints. See Reynolds v. Chater, 82 F.3d 254, 258-59 (8th Cir. 1996).

Plaintiff argues that her depression, fatigue, and syncope constitute significant

nonexertional impairments, which required the ALJ to obtain vocational expert testimony. As discussed above, however, the ALJ considered these impairments and found there was no credible evidence of a nonexertional impairment significantly affecting plaintiff's ability to perform gainful activity. As such, the ALJ's use of the Medical-Vocational Guidelines to find plaintiff not disabled was not error. See Reynolds, 82 F.3d at 258-59.

## **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's applications for Supplemental Security Income benefits under Title XVI of the Social Security Act be affirmed.

The parties are advised that they have eleven (11) days, until September 4, 2006, to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this __22nd__ day of August, 2006.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE